TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-07-00579-CR






John Roman Rocha, Appellant


v.


The State of Texas, Appellee






FROM THE COUNTY COURT AT LAW NO. 7 OF TRAVIS COUNTY

NO. C1CR06732914, HONORABLE ELISABETH ASHLEA EARLE, JUDGE PRESIDING




M E M O R A N D U M O P I N I O N



 A jury convicted John Roman Rocha of the offense of driving while intoxicated. See
Tex. Penal Code Ann. § 49.04 (West 2003). Punishment was assessed at 90 days in jail and a $2,000
fine, but the trial court suspended imposition of the sentence and placed Rocha on community
supervision for two years. In a single point of error, Rocha asserts that the trial court erred in not
submitting an article 38.23 instruction to the jury. See Tex. Code Crim. Proc. Ann. art. 38.23(a)
(West 2005). We will affirm the judgment.


BACKGROUND

 The jury heard evidence that, on the night of April 28, 2006, Officer Rolando Ramirez
of the Austin Police Department was traveling southbound in downtown Austin when he stopped
at a red light at the intersection of Guadalupe and 15th Street. In the lanes next to his, Ramirez
observed a taxi and a 2000 Chevy Trailblazer pickup truck. Ramirez testified that, when the light
turned green, he heard "what appeared to be a vehicle accelerating at a high rate of speed." 
According to Ramirez, he noticed that the taxi was "not moving too fast," but "the truck was making
the back tires squeal." Then, Ramirez recounted, "the truck took off." Ramirez checked his radar
and clocked the vehicle speeding at the rate of 60 miles per hour. The posted speed limit at that
location, Ramirez testified, was 30 miles per hour. Ramirez proceeded to pursue the truck.

 Ramirez testified that he caught up to the vehicle at 11th Street, where it "made a
quick turn to the left . . . still accelerating." Ramirez recalled that the truck "came close to hitting
the back of a vehicle" that was in front of it. The truck then made another left turn onto Lavaca
Street and "started driving real slow, between 12 and 10 miles per hour." Ramirez noticed the right
tires of the truck move into the other lane and cross the white lines. The driver of the truck then
activated his turn signal and came to a stop on the side of the street.

 Ramirez came to a stop behind the truck, approached the driver, and asked to see his
license and registration. According to Ramirez, the driver, now identified as Rocha, "was having
some problems with his movements." Additionally, Rocha "had bloodshot eyes and a strong odor
of alcohol." Ramirez asked Rocha if he had been consuming alcohol. Ramirez testified that Rocha
admitted to him that "he had a couple of mixed drinks." Ramirez also recalled that Rocha sounded
"thick-tongued," meaning that Ramirez had difficulty understanding what Rocha was saying. Ramirez then walked back to his patrol car, moved it to an empty parking lot next
to where they had pulled over, and set up his in-car camera for the purpose of recording Rocha's
performance on field sobriety tests. (1) When Ramirez returned to Rocha's truck, he asked him to
exit his truck and accompany him to the front of his patrol car. According to Ramirez, Rocha
"staggered" as he first exited his truck and walked toward the patrol car. Once Rocha was at the
patrol car, Ramirez again questioned Rocha about his alcohol consumption. Ramirez testified, "At
the beginning, he said he had some--a drink at a bar; he doesn't remember what he was drinking. 
It was Coke and something else. Later, he told me that it was a shot and two drinks. He was not
familiar with the name of the alcohol he was drinking." Ramirez also testified that Rocha was
confused about the location of the bar where he had been drinking; Rocha was not sure if it was
on 5th Street or 6th Street, but he eventually told Ramirez that the bar was called Fabric, which
was on 5th Street.

 Next, Ramirez administered four field sobriety tests--the horizontal gaze nystagmus
(HGN), the walk-and-turn, the one-leg-stand, and the Romberg balance test. On the HGN test,
in which the subject's eye movements are observed, Ramirez noticed "six clues" suggesting
intoxication, which is the most possible that can be observed. On the walk-and-turn test, Ramirez
observed that Rocha "turned improperly and he failed to touch heel to toe." On the one-leg-stand
test, Ramirez testified, Rocha "swayed, he placed his foot down three times, and he used his arms
for balance."

 The final test Ramirez had Rocha perform was the Romberg balance test. Ramirez
explained this test and described Rocha's performance on it as follows:


A: The test consists of me giving him instructions about tilting his head back,
closing his eyes, and estimating 30 seconds. . . . I tell him, after that 30
seconds have passed, for him to lift his head forward and open his eyes.


Q: And what are you looking for in this test?


A: I am looking for the estimation of--of time, and also the sway.


Q: And what did you observe the Defendant do?


A: He had a one-inch sway, and he estimated 30 seconds as 35 seconds.


Q: And is this a standardized field sobriety test?


A: No, it's not.


Q: Then why do you use it?


A: It's just a test that we use to be fair with that person. We look for the
estimation of time, and also the sway. 



 On cross-examination, Officer Ramirez was asked additional questions about Rocha's
performance on the Romberg test. During this line of questioning, the video recording of Rocha's
performance on the test was replayed for the jury, and Ramirez admitted that his estimate of the
amount of time it took Rocha to complete the test was at odds with the recording.


Q: 35 seconds, right?


A: That is what I have down in my PC and report, sir.


Q: From both your observation on the scene and afterwards, watching the tape.


A: That is correct. That's what I estimated.


 (Playing video)


 (Pausing video)


Q: He nailed it, didn't he?


A: It is 27 seconds when he placed his foot face forward. He started at 56, 57, so--


Q: He nailed it.


A: That's correct, sir. It shows 30 seconds.


Q: He passed it.


A: It's not a pass-and-go test. Again, I'm looking for clues of intoxication.


. . . .


Q: And on your own probable cause affidavit, Romberg balance, also known as the head
tilt or modified attention, estimated 30 seconds as--


A: 35 seconds, sir.


Q: And he got 30 seconds, did he not?


A: That is correct, sir.


Q: And you arrested him.


A: Yes, sir.


 Ramirez testified that, after he arrested Rocha and transported him to the
Travis County jail, Rocha agreed to give a breath sample. Ramirez proceeded to administer
two breath tests, approximately three minutes apart. The results of the tests were admitted into
evidence through the testimony of Debra Stephens, a senior forensic scientist with the Austin Police
Department. According to Stephens, the tests showed that Rocha had a blood alcohol concentration
of .151 and .150. To reach those levels, Stephens testified, one would have had to consume "at
least" "about eight or nine drinks."

 The jury subsequently found Rocha guilty of committing the offense of driving while
intoxicated, and Rocha was placed on community supervision. This appeal followed.


ANALYSIS 

 In his sole point of error, Rocha asserts that the trial court erred in failing to submit
an article 38.23 instruction to the jury. Rocha contends that an article 38.23 instruction was required
because Officer Ramirez provided contradictory testimony about Rocha's performance on the
Romberg balance test. On direct, Ramirez testified that Rocha performed the test in 35 seconds. On
cross, however, Ramirez admitted that Rocha performed the test in 30 seconds, as the test's
instructions required. According to Rocha, "the officer's admission raised a fact question as to
whether the officer reasonably believed that Appellant failed the test." Rocha further asserts
that "the officer's admission about the test called his entire credibility into question," and, therefore,
Ramirez's "other reasons for the arrest were disputed fact issues warranting an instruction"
under article 38.23.

 We review claims of jury charge error under the two-pronged test set out in Almanza
v. State, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g). We first determine whether
error exists. Ngo v. State, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005); Swearingen v. State,
270 S.W.3d 804, 808 (Tex. App.--Austin 2008, pet. ref'd). If error exists, we then evaluate the
harm caused by the error. Ngo, 175 S.W.3d at 743; Swearingen, 270 S.W.3d at 808. The degree of
harm required for reversal depends on whether that error was preserved in the trial court. When error
is preserved in the trial court by timely objection, the record must show only "some harm." 
Almanza, 686 S.W.2d at 171. By contrast, unobjected-to charge error requires reversal only if it
resulted in "egregious harm." See Neal v. State, 256 S.W.3d 264, 278 (Tex. Crim. App. 2008).

 Article 38.23 provides that "[n]o evidence obtained by an officer or other person in
violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution
or laws of the United States of America, shall be admitted in evidence against the accused on the trial
of any criminal case." Tex. Code Crim. Proc. Ann. art. 38.23(a). The statute further provides, "In
any case where the legal evidence raises an issue hereunder, the jury shall be instructed that if it
believes, or has a reasonable doubt, that the evidence was obtained in violation of the provisions of
this Article, then and in such event, the jury shall disregard any such evidence so obtained." Id.

 The terms of article 38.23(a) are "mandatory, and when an issue of fact is raised, a
defendant has a statutory right to have the jury charged accordingly." Madden v. State, 242 S.W.3d
504, 510 (Tex. Crim. App. 2007). However, "[a] defendant's right to the submission of jury
instructions under Article 38.23(a) is limited to disputed issues of fact that are material to his
claim of a constitutional or statutory violation that would render evidence inadmissible." Id. In
other words, "The disputed fact must be an essential one in deciding the lawfulness of the challenged
conduct." Id. at 511. "[I]f other facts, not in dispute, are sufficient to support the lawfulness of
the challenged conduct, then the disputed fact issue is not submitted to the jury because it is not
material to the ultimate admissibility of the evidence." Id. at 510. Further, "[t]o raise a disputed fact
issue warranting an Article 38.23(a) jury instruction, there must be some affirmative evidence that
puts the existence of that fact into question." Id. at 513.

 In Madden v. State, the principal case on which Rocha relies, the court of criminal
appeals discussed the circumstances when an article 38.23 instruction is and is not required. See id.
at 513-14. In Madden, the arresting officer, D.P.S. Trooper Lily, observed two vehicles speeding,
a gray Dodge and a green GMC Jimmy. Id. at 506. As Lily pursued both vehicles, the Jimmy
accelerated, passed the Dodge, and began tailing an 18-wheeler. Id. Lily, who had been trained in
"drug convoy tactics," inferred from these actions that the Jimmy driver was attempting to divert his
attention away from the Dodge. Id. Lily testified that he stopped both vehicles for speeding. (2)

 After Lily stopped both vehicles, he approached the driver of the Dodge, who
was identified as the defendant. Id. Lily testified that the defendant's hands were "shaking
tremendously," his face was "trembling," and he "fumbled for his wallet." Lily found this "nervous"
behavior to be suspicious. Id. Lily also testified that the defendant provided inconsistent answers
to questions about where he had come from, how long he had been there, and where he was going. 
See id. Additionally, Lily explained, the defendant told him that he was driving a rental car. Id. 
When Lily examined the rental agreement, he saw that the vehicle had been rented in Florida
and that the agreement had expired four days earlier. Id. Suspecting that the defendant's vehicle
contained contraband, Lily detained the defendant until drug dogs arrived so that the vehicle could
be searched for illegal drugs. Id. When the drug dogs arrived, cocaine was found inside the vehicle. 
Id. at 507.

 During trial, a video recording of the traffic stop and detention was played for
the jury. Id. On the recording, the defendant could be heard disputing the fact that he had been
speeding. Id. On cross-examination, defense counsel also questioned Lily extensively about
whether the defendant was really acting nervous during the stop, claiming that he (defense counsel)
could not see the defendant's nervous behavior on the recording. Id. However, Lily maintained in
his testimony that the defendant was acting nervous and that the recording confirmed this, even
though the poor quality of the recording might have made the defendant's behavior difficult to
observe on tape. Id.

 At the charge conference, defense counsel requested an article 38.23 instruction
on the legality of both (1) the initial traffic stop for speeding; and (2) the defendant's continued
detention until the drug dogs arrived. The trial court concluded that there was a disputed fact issue
about whether the defendant was speeding, thus it agreed "that there should be a charge on that
issue." Id. at 508. However, finding no disputed fact issue regarding the defendant's continued
detention, the trial court declined to submit an article 38.23 instruction on that issue. Id.

 The court of criminal appeals agreed with the trial court, on both issues. The basis
for the traffic stop was Lily's belief that the defendant had been speeding. Id. at 511. Lily testified
that he clocked the defendant's vehicle going 61 miles per hour in a 55 miles-per-hour zone. Id.
at 506. However, on the recording of the traffic stop, the defendant could be heard telling Lily that
he was not speeding and that his cruise control had been set at 55 miles per hour. Id. at 507 Thus,
there was "affirmative evidence" in the record disputing the sole fact that provided the basis for the
traffic stop. Id. at 514. Accordingly, the court held, an article 38.23 instruction on that issue was
required. Id. at 511.

 On the other hand, the court of criminal appeals held that an article 38.23 instruction
was not warranted on the issue of the defendant's continued detention, for two reasons. First, "there
was no conflict in the evidence" regarding the facts on which Lily relied in continuing to detain the
defendant. Id. at 513. The court explained that Lily, despite being extensively cross-examined by
defense counsel, "never admitted that he was wrong about appellant's nervous behavior." Id. at 515. 
As for the videotape that purported to show the defendant's nervous behavior or lack thereof, the
court concluded that the recording "apparently does not show much of anything with clarity." (3) Id.
at 516. Thus, there was no "affirmative evidence of a disputed historical fact" relevant to the issue
of the defendant's continued detention. Id.

 Second, the court reasoned that, "[e]ven if the videotape or a witness had provided
affirmative evidence that the defendant did not, in fact, appear to be nervous when Trooper Lily
encountered and questioned him, the officer still had ample basis for his reasonable suspicion to
detain appellant for the arrival of the drug dog." Id. The court explained,


If Trooper Lily did not have reasonable suspicion to detain appellant unless he acted
nervously, then a dispute about that fact would require a jury instruction. If,
however, appellant's purported nervousness is not a fact that is crucial to a legal
finding of reasonable suspicion, then that disputed fact issue need not be submitted
to the jury. 



Id. at 517. In the court's view, the "totality of the other facts" in the case "was legally sufficient
to support further detention," and the defendant's "purported nervousness is
lagniappe--icing-on-the-cake--to the determination of reasonable suspicion. It is not crucial." Id. 
The court concluded that, "to obtain a jury instruction under Article 38.23(a), the disputed fact
must be one that affects the determination of the legal issue." Id.

 In this case, the legal issue during trial was whether Ramirez had probable cause to
arrest Rocha for DWI. The disputed fact was Rocha's performance on the Romberg balance test. 
Thus, the trial court was required to submit an article 38.23 instruction if this disputed fact was
material to the determination of whether Ramirez had probable cause to arrest Rocha for DWI. We
conclude that it was not.

 "'Probable cause' for a warrantless arrest exists if, at the moment the arrest is made,
the facts and circumstances within the arresting officer's knowledge and of which he has reasonably
trustworthy information are sufficient to warrant a prudent man in believing that the person arrested
had committed or was committing an offense." Amador v. State, 275 S.W.3d 872, 878 (Tex. Crim.
App. 2009) (citing Beck v. Ohio, 379 U.S. 89, 91 (1964)). "The test for probable cause is an
objective one, unrelated to the subjective beliefs of the arresting officer, and it requires a
consideration of the totality of the circumstances facing the arresting officer." Id. (citing Maryland
v. Pringle, 540 U.S. 366, 371 (2003)).

 The totality of the circumstances facing Ramirez at the time he arrested Rocha for
DWI included the following:



 Ramirez clocked Rocha speeding at the rate of 60 miles per hour in downtown Austin,
make a quick left turn onto 11th Street while accelerating, and "c[o]me close to hitting
the back of a vehicle" that was in front of him. According to Ramirez, Rocha then made
another left turn onto Lavaca Street and "started driving real slow, between 12 and 10
miles per hour." Before Rocha pulled over, Ramirez noticed Rocha's right tires move
into the other lane and cross the white lines.

 Ramirez testified that, when he approached Rocha, he observed that Rocha "had
bloodshot eyes and a strong odor of alcohol" and "was having some problems with his
movements" when he displayed his license. Rocha also sounded "thick-tongued,"
meaning that Ramirez had difficulty understanding what he was saying.
 Rocha at first admitted to Ramirez that "he had a couple of mixed drinks." Later, Rocha
told Ramirez that he had a shot and two drinks. However, Rocha was unable to
remember what kind of alcohol he had been drinking, and he was also confused about
the location of the bar where he had been drinking.

 According to Ramirez, when Rocha exited his truck and walked toward the patrol car to
perform the field sobriety tests, his initial movements were "staggered."

 On the HGN test, Ramirez noticed "six clues"--the most possible--suggesting that
Rocha was intoxicated.


 


 On the walk-and-turn test, Ramirez observed that Rocha "turned improperly and he failed
to touch heel to toe."


 


 On the one-leg-stand test, Ramirez testified, Rocha "swayed, he placed his foot down
three times, and he used his arms for balance."




 The trial court could have found that the above facts were sufficient to provide
Ramirez with probable cause to arrest Rocha for committing the offense of DWI, even in the
absence of any testimony about Rocha's performance on the Romberg balance test. See id. at 879
(finding probable cause to arrest defendant for DWI when officer observed defendant speeding,
responding slowly to officer requests, smelling of alcohol, and officer administered only three
field sobriety tests (HGN, walk-and-turn, and one-leg-stand)); Washburn v. State, 235 S.W.3d 346,
351 (Tex. App.--Texarkana 2007, no pet.) (finding probable cause to arrest defendant for DWI when
defendant admitted drinking, had slurred speech, and officer could detect odor of alcohol on or
about defendant's person); Knisley v. State, 81 S.W.3d 478, 483-84 (Tex. App.--Dallas 2002,
pet. ref'd) (finding probable cause to arrest defendant for DWI when evidence at accident
scene suggested defendant lost control of motorcycle, defendant was unable to answer simple
questions, and defendant smelled strongly of alcohol); Reynolds v. State, 902 S.W.2d 558, 560
(Tex. App.--Houston [1st Dist.] 1995, pet. ref'd) (finding probable cause to arrest defendant for
DWI when officer testified defendant had slurred speech, bloodshot eyes, breath that smelled of
alcohol, and posed danger to himself and others). In fact, Ramirez testified that the Romberg test
was neither a standardized field sobriety test nor a "pass-and-go test," and he administered it after
Rocha performed the other tests just "to be fair" with Rocha. As Ramirez explained, throughout his
investigation, he was "looking for clues of intoxication," and the Romberg test was just one part of
this process. Ramirez testified:


Q: And after this test [the one-leg-stand], you still had not formed any opinion
whether he was intoxicated.


A: No. I'm still trying to give him the benefit of the doubt that he's not
impaired, he's able to drive a motor vehicle, sir.


Q: It was after the next and last test, the Romberg balance, that you finally
formed the opinion that he was intoxicated.


A: That was just that test. I gathered the whole thing. The driving, the speech,
the odor of alcohol, everything together. Then I made my decision to make
the arrest or not, sir.


 Q: Okay. At this point, after this test, still no decision. Still open-ended. It's
like you want to do another test just to give him the benefit of the doubt. You
wanted to be fair. At least--


A: Again, I'm--I'm gathering all the information. I have everything in mind
that I saw, that I smell, everything I heard. After everything is done, the last
test--I gave him the last test; and after everything is done, then I make my
decision to make the arrest or not.


Q: Okay. So at this point, still no opinion.


A: I have my opinion, sir, but it's not that I'm going to arrest this person or not. 
I have everything in mind.


Q: Have you ever stopped at this point, or even earlier, because you've already
formed the opinion, and arrested somebody? Not go through all the tests?


A: No, sir.


Q: You're saying you've always done all four tests on every single person
you've ever stopped.


. . . .


A: I follow the NHTSA manual and the rules. And I have to do at least--all the
tests. The Romberg balance is just an extra test we give them. We have the
option to do it or not. In this case, I did the Romberg balance.



Thus, the disputed fact regarding Rocha's performance on the Romberg test was not "essential" to
the determination of whether Ramirez had probable cause to arrest Rocha for DWI. See Madden,
242 S.W.3d at 511; see also Merriweather v. State, 501 S.W.2d 887, 891 (Tex. Crim. App. 1973)
(holding that, when specific facts used by court to determine existence of probable cause were
uncontested, defendant was not entitled to jury instruction concerning other facts--which were
contested--that did not defeat finding of probable cause); 40 George E. Dix & Robert O. Dawson,
Texas Practice: Criminal Practice and Procedure § 4.194 (2d ed. 2001) ("Jury submission, then,
is only required when facts are raised that are necessarily determinative of the admissibility of
the challenged evidence."). Accordingly, Rocha was not entitled to an article 38.23 instruction
on this issue.

 Rocha concedes that "the other facts Officer Ramirez testified about--if true--would
support a finding of probable cause, aside from his performance on the Romberg balance test." 
However, Rocha claims that Ramirez's contradictory testimony about the Romberg test calls into
question the truthfulness of his entire testimony. Rocha asks,

If an officer admits that one of the facts leading him to arrest a defendant did not
exist, does not that create a dispute as to the other facts, too? If Ramirez's
conclusion about the balance test was untrue or incorrect, does that not bring into
question his testimony about the other sobriety tests, too?


Rocha claims that this issue has not been addressed by the court of criminal appeals. To the
contrary, as we have already explained, in Madden, the court held that, in order for a defendant to
be entitled to an article 38.23 instruction, there must be some "affirmative evidence" that puts the
existence of a fact into dispute. See id. at 513. Here, no affirmative evidence contesting the other
facts supporting the officer's probable-cause determination was presented. 

 Rocha explains that the defense strategy during trial was to repeatedly attack and
undermine Ramirez's credibility with the jury. According to Rocha, "beginning with trial counsel's
very first question to the officer,[ (4)] the defense strategy was to challenge Officer Ramirez on virtually
everything he said." A similar strategy was employed in Madden. See id. at 507 n.4 (reprinting
certain portions of trial counsel's extensive cross-examination of Trooper Lily). However, the
court held that "a cross-examiner's questions do not create a conflict in the evidence, although
the witness's answers to those questions might." Id. at 513. The court explained that, despite the
extensive cross-examination to which Lily was subjected, "the officer never admitted that he
was wrong about appellant's nervous behavior." Id. at 515. Similarly, in this case, despite defense
counsel's extensive cross-examination of Ramirez, Ramirez's only admission was that he was wrong
about Rocha's performance on the Romberg test. Ramirez did not admit that he was wrong about
any other fact on which he relied in forming his opinion that Rocha was driving while intoxicated. 
Thus, there was no affirmative evidence putting the existence of these other facts into dispute, only
insinuations by defense counsel that Ramirez was lying about them. That is not enough to entitle
Rocha to an article 38.23 instruction. See id.; see also Garza v. State, 126 S.W.3d 79, 86-87 & n.3
(Tex. Crim. App. 2004) (explaining that "mere insinuations by appellant's attorney" that police acted
improperly did not create fact issue that police acted improperly, nor did defense cross-examination
of police officers who consistently denied suggestion of impropriety); Rose v. State, 470 S.W.2d 198,
200 (Tex. Crim. App. 1971) ("No witness was called by the appellant to controvert the testimony
of the officers. The cross-examination did not raise a fact issue on the right to arrest. Therefore,
the court did not err in refusing the [article 38.23] charge."); Shpikula v. State, 68 S.W.3d 212, 217
(Tex. App.--Houston [1st Dist.] 2002, pet. ref'd) (rejecting defendant's contention that jury's right
to disbelieve State's evidence, in absence of controverting evidence, entitled him to article 38.23
instruction); Cerda v. State, 10 S.W.3d 748, 757 (Tex. App.--Corpus Christi 2000, no pet.) (holding
that impeachment of officer on collateral matter does not create factual issue on lawfulness of
defendant's arrest); Trent v. State, 925 S.W.2d 130, 133 (Tex. App.--Waco 1996, no pet.) (rejecting
defendant's contention that he was entitled to article 38.23 instruction on issue of probable cause
because "he sufficiently attacked the credibility" of citizen who arrested him); 40 Dix & Dawson,
§ 4.194 at 282 (noting that "a fact issue is not generated by the possibility that the jury may
disbelieve all or some of [the State's] testimony").

 Because there was no disputed fact issue that was material to the lawfulness of the
challenged conduct in this case, we conclude that the trial court did not err in refusing to submit an
article 38.23 instruction to the jury. We overrule Rocha's sole point of error.


CONCLUSION

 We affirm the judgment of the trial court.



 __________________________________________

 Bob Pemberton, Justice

Before Justices Patterson, Pemberton and Waldrop

Affirmed

Filed: May 12, 2009

Do Not Publish
1. The video recording was played for the jury during Ramirez's testimony.
2. See Madden v. State, 177 S.W.3d 322, 324 (Tex. App.--Houston [1st Dist.] 2005), rev'd,
242 S.W.3d 504 (Tex. Crim. App. 2007). 
3. The court explained that it was unable to review the videotape because it was not included
in the appellate record. Therefore, the court deferred to the trial court's assessment of the exhibit's
lack of clarity. See Madden v. State, 242 S.W.3d 504, 516 (Tex. Crim. App. 2007).
4. Counsel's first question on cross-examination was, "Officer Ramirez, do you want to just
come out now and tell these jurors you're a liar?"